Robert E. **MILLIGAN,** Petitioner–
Appellant,

v.

**COMMISSIONER INTERNAL
REVENUE SERVICE,**
Respondent–Appellee.

No. 93–70273.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted June 15, 1994.

Decided Oct. 25, 1994.

David L. Haga, Jr., Robert P. Solliday, Carolyn R. Matthews and Arthur W. Peterson, Mohr, Hackett, Pederson, Blakley, Randolph & Haga, Phoenix, AZ, for petitioner-appellant.

Alice L. Ronk, Asst. Atty. Gen., Tax Div., Dept. of Justice, Washington, DC, for the respondent-appellee.

Bogdan Rentea and Oren L. Connaway, Rentea & Associates, Austin, TX, amicus curiae, for United Farmer's Agent Ass'n, Nat. Ass'n of American Family Agents, and Nat. Ass'n of State Farm Agents, Inc.

Before GOODWIN, PREGERSON, and RYMER, Circuit Judges.

PREGERSON, Circuit Judge:

Robert E. Milligan ("Milligan") appeals the tax court's order and decision upholding the Commissioner of Internal Revenue's determination of a deficiency in Milligan's federal income tax for the taxable year 1987 in the amount of $3,076.00. We have jurisdiction under 26 U.S.C. § 7482(a)(1). We reverse.

## BACKGROUND

On April 12, 1949, Appellant Milligan began working as an exclusive insurance agent, on an independent contractor basis, for State Farm Insurance Company ("State Farm"). As a State Farm insurance agent, Milligan sold and serviced insurance policies for four sub-companies of State Farm—State Farm Mutual Automobile Insurance Company ("State Farm–Auto"), State Farm Life Insurance Company ("State Farm–Life"), State Farm Fire and Casualty Company ("State Farm–Fire"), and State Farm General Insurance Company ("State Farm–General").

On March 1, 1977, Milligan and State Farm entered into the fourth of a succession of agency contracts entitled State Farm Agent's Agreement (the "Agent's Agreement"). (ER 52–77). According to the Agent's Agreement, Milligan's compensation consisted of commissions on all personally-produced policies, "service compensation" for his services on existing policies, and renewal

commissions on State Farm–Fire and State Farm–General policies previously written by him. (ER 53: § II; 58, 60–61, 63–64, 66–67). State Farm compensated Milligan in full when and as he earned commissions, service compensation, and renewal commissions. No portion of his compensation was ever deferred to create "Termination Payments." (*See* ER 59, 62, 65, 68, 70) (Any unpaid compensation payable at the time of termination shall be paid as soon as ascertainable and shall constitute the final payment under the schedule of compensation payments.); (ER 89: 11/16/90 letter to Milligan).

Milligan retired on August 13, 1983, by providing written notice of termination of the Agent's Agreement (*see* ER 54: § III.A) (agreement terminated upon Milligan's death or written notice by either party). Because the Agent's Agreement was terminated more than two years after its effective date, the termination made Milligan eligible to receive five years of monthly Termination Payments from State Farm. (ER 54: § IV.A). The section of the Agent's Agreement entitled "Compensation" (§ II) did not include or refer to the section entitled "Termination Payments" (§ IV).

For the first post-termination year, the Agent's Agreement required each of the State Farm companies to compute Termination Payments based on a percentage of Milligan's compensation during the previous twelve months (generally 20% of the income generated by personally-produced policies in that year), (ER 54–55: § IV.A.1–2), "less any

deductions for commission charge-backs[1] ...." (*Id.* § IV.A).[2] For the subsequent four years of Termination Payments, each company was required to pay an amount equal to 1/12th the amount payable in the first post-termination year, (*id.* § IV.A.1–2), less commission charge-backs.[3] None of these Termination Payments depended upon the length of Milligan's service for State Farm and overall earnings, or his commissions from assigned policies and other compensation during the final pre-termination year.

Milligan had no vested right to receive any Termination Payments. The Agent's Agreement conditioned the Termination Payments upon two contractual requirements, (ER 54, § IV.A): (1) returning State Farm's property within ten days of termination entitled an agent to two months of Termination Payments, (ER 56, § IV.B.1), and (2) refraining from competing with all of the State Farm sub-companies for a period of one-year entitled an agent to subsequent Termination Payments, (*id.* § IV.B). After retiring in 1983, Milligan returned State Farm's property and did not engage in any insurance sales activities or other trade or business, (ER 20, ¶ 31).

The Agent's Agreement also conditioned the Termination Payments upon certain adjustments to reflect: (1) the amount of income the State Farm companies received on Milligan's book of business during the first post-termination year, and (2) the number of his personally-produced policies cancelled

1. Commission charge-backs are commissions paid on cancelled policies, meaning that Milligan had received commissions in excess of those he actually earned. In effect, State Farm was entitled to offset monies owed *by* Milligan against monies owed *to* Milligan as Termination Payments.

2. In particular, State Farm–Auto would pay Milligan a percentage of his prior service compensation on personally-produced policies. (*Id.* § IV.A.1(a)). And, State Farm–Fire and State Farm–General would pay him the lesser of a percentage of the commissions he had been paid on personally-produced policies, or the commissions he would have been paid on personally-produced renewal premiums had the Agent's Agreement not been terminated. (*Id.* § IV.2(a)).

3. The above discussion describes the payment calculations made by State Farm–Auto, State

Farm–Fire, and State Farm–General. The Agent's Agreement created a different payment structure for payments from State Farm–Life. State Farm–Life was required to compute all five years of Termination Payments based on 100% of the amount Milligan would have received during the post-termination years on personally-produced and assigned policies had the Agent's Agreement not been terminated, (ER 56: § IV.A.3; 71–72), less commission charge-backs. Milligan conceded that the $345.00 in Termination Payments he received in 1987 from State Farm–Life were taxable as self-employment income, meaning that the character of those payments is not at issue on appeal. *But see* note 8 *infra* (significant differences between the payments from State Farm–Life and the disputed payments might justify disparate tax treatment).

during that year. *See* ER 54–55: §§ IV.A.1(c), IV.A.2(c) (Payment amounts were "subject to appropriate adjustments following a determination of the net premium collections [received and recorded on State Farm–Auto policies, and the level of commissions State Farm–Fire and State Farm–General received on Milligan's personally-produced renewal premiums, in the twelve months following the date of termination] ... and the number of policies in force [during the same twelve month post-termination period].").

During taxable years 1985 and 1986, Milligan reported the Termination Payments he received for both income tax and self-employment tax. However, for taxable year 1987, when Milligan received $25,121.00 in Termination Payments, he reported the payments only for income tax. The Commissioner of Internal Revenue (the "Commissioner") issued Milligan a Notice of Deficiency in the amount of $3,076.00 for unpaid self-employment tax for 1987.

On February 11, 1991, Milligan filed a petition in the tax court seeking a redetermination of the tax deficiency asserted against him. He contested the deficiency based on $24,776.00 in payments from State Farm–Auto, State Farm–Fire, and State Farm–General.[4]

On November 12, 1992, the tax court entered a decision that determined a deficiency in the amount of $3,076.00. The tax court found that the entire amount of 1987 Termination Payments was deferred compensation that State Farm offered to induce agents to enter into the Agent's Agreement. The court reasoned that, as deferred compensation, the Termination Payments "derived" or "emanated" from Milligan's insurance sales business and were therefore subject to self-employment tax. Milligan appeals.

**4.** In 1987, Milligan received $15,354.00 from State Farm–Auto, $8,450.00 from State Farm–Fire, and $972.00 from State Farm–General.

**5.** "[T]here shall be excluded any gain or loss—(A) which is considered as gain or loss from the sale or exchange of a capital asset [i.e., capital gain or loss] ... or (C) from the sale, exchange ... or other disposition of property if such property is

## ANALYSIS

The tax court concluded that Milligan's 1987 Termination Payments were taxable as individual self-employment income. We review the tax court's findings of law de novo, *Pacific First Fed. Sav. Bank v. Commissioner,* 961 F.2d 800, 803 (9th Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 209, 121 L.Ed.2d 150 (1992), and findings of fact for clear error, *Vukasovich v. Commissioner,* 790 F.2d 1409, 1411 (9th Cir.1986). None of the underlying facts in this case are in dispute. Rather, the parties' dispute relates to the conclusion that should be drawn from the underlying facts—"whether the facts satisfy the statutory standard" for self-employment tax. *Pullman–Standard v. Swint,* 456 U.S. 273, 290 n. 19, 102 S.Ct. 1781, 1791 n. 19, 72 L.Ed.2d 66 (1982). This is a mixed question of law and fact, reviewable de novo. *Id.*

The Self–Employment Contributions Act ("SECA"), §§ 1401–1403 of the Internal Revenue Code, imposes a separate tax on the annual self-employment income of every individual. 26 U.S.C. § 1401. To be taxable as self-employment income, an individual's income must be (1) derived, (2) from a trade or business, (3) carried on by that individual. *See* 26 U.S.C. § 1402(b) (defining "self-employment income" as "the net earnings from self-employment derived by an individual ... during any taxable year"); 26 U.S.C. § 1402(a) (defining "net earnings from self-employment" as "the gross income [minus exclusions from gross income[5]] derived by an individual from any trade or business carried on by such individual").

Milligan agrees with the tax court that the "trade or business" and "carried on" requirements have been satisfied. In other words, he agrees that the Termination Payments are subject to self-employment tax if they were "derived" from the carrying on of his previous work as an insurance agent.

neither [includible in inventory nor property held for sale to customers in the ordinary course of business]." 26 U.S.C. § 1402(a)(3)(A), (C). Gain or loss from "sale, exchange, or other disposition of property" includes a disposition that creates ordinary gain or loss, as opposed to capital gain or loss. Treas.Reg. § 1.1402(a)–6(a) (as amended in 1965).

*Simpson v. Commissioner,* 64 T.C. 974, 989, 1975 WL 3150 (1975) (self-employment tax on insurance agent's trade or business earnings, e.g., commissions, as an independent contractor); *Erickson v. Commissioner,* 64 T.C.M. (CCH) 963, 966, 1992 WL 245517 (1992), *aff'd without op.,* 1 F.3d 1231 (1st Cir.1993) (self-employment tax on deferred payments of unpaid commissions and renewal commissions to former insurance agent). It is immaterial that Milligan was no longer self-employed in 1987 when he received the Termination Payments. Treas.Reg. § 1.402(a)–1(c) (as amended in 1974) (Gross income derived from a trade or business "includes gross income received ... in the taxable year even though such income may be attributable in whole or in part to services rendered or other acts performed in a prior taxable year...."); *Shumaker v. Commissioner,* 648 F.2d 1198, 1200 (9th Cir.1981) (affirming self-employment tax on sale proceeds from wheat taxpayer grew in the past: "[S]elf-employment income is determined by the *source* of the income, not the taxpayer's *status* at the time the income is realized.") (Emphasis added.)

■ Milligan disputes only whether the 1987 Termination Payments were "derived" from the trade or business carried on by him within the meaning of the tax code and regulations. The term "derive" requires "a nexus between the income received and a trade or business that is, or was, actually carried on." *Newberry v. Commissioner,* 76 T.C. 441, 444, 1981 WL 11375 (1981). By nexus, we mean that the "trade or business activity by the taxpayer *gives rise to* the income...." *Id.* (emphasis added). The income is sufficiently related to the taxpayer's trade or business activity when the business *activity* is its source. *Id.* at 446 ("Any income *must arise from* some actual ... *income-producing ac-*

*tivity* of the taxpayer before such income becomes subject to ... self-employment taxes...."). *See, e.g., Shumaker,* 648 F.2d at 1200 (income derived from selling wheat from prior farming activity).

■ We are not prepared to characterize the precise relationship between the Termination Payments and Milligan's prior business activity. Ambiguities in the Agent's Agreement prevent us from doing so.[6] But, despite the ambiguities, we *can* see that the Termination Payments did not "derive" from Milligan's prior business activity within the meaning of the self-employment tax. To be taxable as self-employment income, earnings must be tied to the quantity or quality of the taxpayer's prior labor, rather than the mere fact that the taxpayer worked or works for the payor.

Here, the Termination Payments were linked only to Milligan's previous status as a two year-plus independent contractor for State Farm. Had Milligan not worked for State Farm, he never would have received the Termination Payments. And, had he worked for State Farm for less than two years, or had he not generated any policies that produced commissions (or service compensation with respect to State Farm–Auto, *see* ER 54–55: § IV.A.1(a)) in the final pre-termination year, he would have received nothing.

■ Without more, this link between the disputed payments and any business activity carried on by Milligan does not satisfy the "derive" requirement. It is not enough that, had the taxpayer not performed certain services (that were fully compensated for)—not been an independent contractor, for example—the taxpayer never would have received the disputed payments. *See Newberry,* 76 T.C. at 445 (harmonizing self-employment

6. It would appear that Milligan received the Termination Payments because he stopped working for State Farm and did not compete with State Farm. The payments derived from termination of the Agent's Agreement (termination of Milligan's business activity for State Farm), and Milligan's compliance with the contractual covenant not to compete (and return of State Farm property). Payments derived from the cessation of Milligan's business activity are not subject to self-employment tax. *See Newberry,* 76 T.C. at 446

(holding that insurance proceeds were not taxable self-employment income where taxpayer's inability to operate a destroyed grocery store, rather than the carrying on of a business, gave rise to the proceeds). Nor does the self-employment tax apply to payments derived from noncompetition with State Farm. *Barrett v. Commissioner,* 58 T.C. 284, 289, 1972 WL 2450 (1972) ("Noncompetition does not constitute the carrying on of a trade or business.").

tax with the Federal Unemployment Tax Act and the Federal Insurance Contributions Act:[7] An individual who becomes eligible for benefits as a "result of the individual's employ[ment] status at some previous time" has not received wages subject to social security tax. "[I]n no way are the benefits a function of the employee's *providing services* for his employer. Those benefits are not derived from any employment carried on.").

Because Milligan already had been fully compensated for his services, none of his business activity was the "source" of the Termination Payments. The payments did not represent deferred compensation of previously-earned commissions, *cf. Erickson, supra*, because none of Milligan's earnings were deferred, i.e., he had no vested right to payment of an identifiable money amount. Nor were they renewal commissions on previously-generated policies, *cf. id.; Becker v. Tomlinson*, 9 A.F.T.R.2d 1407, 1409–10 (S.D.Fla.1962), or retirement income tied to Milligan's years of service and overall earnings.

At most, the *amount* of the Termination Payments, not the payments themselves, actually arose from Milligan's business activity. Milligan had a contingent right to receive an uncertain amount of money or nothing, depending upon the level of his prior business activity leading to compensation in his final year as an agent. The payment amount depended upon the level of his commissions (and service compensation from State Farm–Auto) on personally-produced policies, i.e., his previous value as a State Farm insurance agent.

However, in part, even the payment *amount* did not depend upon the level of Milligan's prior business activity because the Termination Payments were subject to two adjustments *unrelated* to any business activity on Milligan's part for State Farm. The State Farm companies adjusted the Termination Payments to reflect the amount of income received on Milligan's book of business during the first post-termination year, and the number of his personally-produced policies cancelled during that year. If all of Milligan's customers had cancelled their State Farm non-life policies during the first post-termination year, then Milligan would have received nothing. The adjusted payment amount depended *not* upon Milligan's past business activity, but upon the successor agent's future business efforts to retain Milligan's customers and to generate service compensation for State Farm. In this way too, the disputed Termination Payments did not "derive" from *Milligan's* prior services.

Therefore, the tax court erred by characterizing the Termination Payments as earnings derived from the carrying on of Milligan's trade or business. As stated in *supra* note 3, we express no opinion on whether the Termination Payments from State Farm–Life are subject to self-employment tax. We therefore reject the Commissioner's suggestion that the tax status of the State Farm–Life payments. affects that of the disputed Termination Payments provided for in the same Agent's Agreement.

Nonetheless, we note two significant differences, which might justify disparate tax treatment, between the payments from State Farm–Life and the disputed payments. First, payments from State Farm–Life represent unpaid earned income from Milligan's prior life insurance sales. He received the same compensation from those insurance policies that he would have received had the Agent's Agreement not been terminated. In contrast, Termination Payments from the other three State Farm companies were monies that Milligan would *not* have received had the Agent's Agreement not been terminated. He received these payments precisely because he was no longer working for State Farm. These payments were calculat-

---

7. The self-employment tax on self-employed individuals is the counterpart to the tax on employees' wages under the Federal Unemployment Tax Act ("FUTA") and the Federal Insurance Contributions Act ("FICA"). *Steffens v. Commissioner*, 707 F.2d 478, 481 (11th Cir.1983) (citing *Newberry v. Commissioner*, 76 T.C. 441, 443, 1981 WL 11375 (1981)). The wage tax under both FUTA

and FICA attaches to "all remuneration for employment." *See* 26 U.S.C. § 3121(a) (FICA wage definition), *id.* § 3306(b) (FUTA wage definition). " 'Employment' [under FICA] means any *service*, of whatever nature, performed ... by an employee for the person employing him...." 26 U.S.C. § 3121(b) (emphasis added); *id.* § 3306(c) (same under FUTA).

ed based on Milligan's past earnings, which had been fully paid, and were not made to compensate him for prior labor. Second, Termination Payments from State Farm–Life were not subject to adjustments unrelated to Milligan's business activity. The Termination Payments are not subject to self-employment income tax. Because we conclude that the Termination Payments are not derived from the carrying on of Milligan's trade or business, we need not decide whether the payments are within the exclusion, 26 U.S.C. § 1402(a)(2)(A), (C), *supra* note 5, for capital gain and ordinary gain from the sale, exchange or other disposition of property.

REVERSED.