T.C. Memo. 1996-269

UNITED STATES TAX COURT

ROBERT SCHELBLE AND SUSAN SCHELBLE, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 12747-93.                    Filed June 12, 1996.

<u>Richard Clark</u>, for petitioners.

<u>James Gehres</u>, for respondent.

MEMORANDUM OPINION

FAY, <u>Judge</u>:  By statutory notice of deficiency dated
March 17, 1993, respondent determined deficiencies in peti-
tioner's[1] income tax for the taxable years 1989, 1990 and 1991,
in the amounts of $4,334, $4,489 and $1,362, respectively.  The
sole issue for decision is whether termination payments provided
by petitioner's employer and received by petitioner after
retirement from service as an independent insurance agent are

_____

[1]All references to petitioner are to Robert Schelble.

capital assets from the sale of petitioner's insurance agency or are self-employment income subject to the self-employment tax under sections 1401[2] and 1402.  We hold that the payments are self-employment income subject to self-employment tax.

This matter was submitted to the Court fully stipulated pursuant to Rule 122.  The stipulation of facts and the exhibits attached thereto are incorporated by this reference.

At the time the petition was filed, petitioners resided in Fort Collins, Colorado.  On March 13, 1973, petitioner executed a Career Agent's Agreement (the Agreement) with American Family Life Insurance Co., American Family Mutual Insurance Co., and American Standard Insurance Co. of Wisconsin (collectively the Companies).  The Companies' principal office was at Madison, Wisconsin.

According to the Agreement, an insurance agent of the Companies could be eligible for "extended earnings" when the Agreement was terminated.  Aside from certain paperwork and reporting requirements, the elements which must be satisfied under the Agreement in order for an agent to qualify for extended earnings are:  (a) Within 10 days of termination, the agent must return to the Company all policies and policy records, manuals, materials, advertising and supplies or other property of the

---

[2]All section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure, unless otherwise indicated.

Company; (b) the agent must have represented the Company for at least 5 years; (c) the agent must have a specified number of policies in force at the time of termination; and (d) the agent must not "associate himself in any sales or sales management capacity with another insurer engaged in writing any of the kinds of insurance written by the company".

If an agent qualifies to receive extended earnings, the amount of those earnings is a specified percentage of the renewal service fees[3] which were paid to the agent during his final 6 or 12 months prior to termination. The percentage increases with the agent's consecutive years of service. The extended earnings are payable under the Agreement regardless of the cause of termination and regardless of the age of the agent at the time of termination. In the event of an agent's death prior to the complete payout of the extended earnings, his legal representatives are entitled to receive the earnings which the agent would have received had he not died.

Petitioner needed to be a licensed insurance agent in order to sell insurance for the Companies. Petitioner was responsible for all business expenses involved in operating his insurance agency. The Companies owned the policies, endorsements, policy records, manuals, materials, and supplies used by petitioner to

---

[3]Renewal service fees are payments made to an agent as a service fee when an insurance policy is renewed and consist of a percentage of the premiums paid by the insured.

sell the Companies' insurance. Petitioner was obligated to return all of these items to the Companies when the Agreement was terminated. Petitioner was permitted to use the Companies' names and symbols, until the Agreement was terminated. Additionally, the Agreement provided that petitioner was not an employee of the Companies but an independent contractor. Petitioner had control of his activities as to the time, place, and manner of soliciting clients.

As of March 31, 1988, petitioner terminated the Agreement with the Companies and elected to receive his extended earnings in 36 monthly installments. Petitioner was entitled to receive $93,345.89 of extended earnings benefits payable in 35 monthly installments of $2,592.95 with the last check in the amount of $2,592.64. Petitioner received the extended earnings payments from the Companies as follows:

| | |
|---|---|
| 1988 | $20,743.60 |
| 1989 | 31,115.40 |
| 1990 | 31,115.40 |
| 1991 | 10,371.49 |
| Total | 93,345.89 |

Petitioners timely filed joint Federal income tax returns for 1989, 1990, and 1991. Petitioners reported the extended earnings received in 1989, 1990, and 1991 on Schedule D, Capital Gains and Losses, as proceeds from the sale of an insurance agency.

On March 17, 1995, respondent sent, via certified mail, a statutory notice of deficiency to petitioners setting forth deficiencies in petitioners' Federal income tax for the taxable years 1989, 1990, and 1991.  Respondent contends that petitioner's extended earnings are subject to the self-employment tax under sections 1401 and 1402, because the extended earnings paid to petitioner were derived from petitioner's prior insurance business.  Petitioners contend that the extended earnings are the proceeds from the sale of petitioner's insurance agency to the Companies and are, therefore, proceeds from the disposition of a capital asset.  In the alternative, petitioners argue that the extended earnings are not sufficiently related to petitioner's past insurance business in order to make the payments subject to self-employment tax under sections 1401 and 1402.

Respondent contends that the "extended earnings" paid to petitioner by the Companies constitute self-employment income for purposes of the self-employment tax under sections 1401 and 1402, because the payments were derived from a trade or business carried on by petitioner.  Petitioners have the burden of proving respondent's determination is incorrect.  Rule 142(a); Welch v. Helvering, 290 U.S. 111 (1933).  Petitioner argues that his relinquishment to the Companies of the records and lists he maintained with respect to the policies he sold and the policy-holders to whom he provided service was tantamount to the sale of business "goodwill" to the Companies.  Thus, petitioners argue

that the "extended earnings" qualify for capital asset treatment under section 1221, since they arose from the sale of assets used in a business. Petitioners cite Killian v. Commissioner, 314 F.2d 852 (5th Cir. 1963), affg T.C. Memo. 1961-83, and Kenney v. Commissioner, 37 T.C. 1161 (1962), to support their theory that the "extended earnings" payments constitute proceeds from the sale of "goodwill". These cases are of no particular assistance to petitioners. Neither case involved "extended earnings" or similar payments made under an agency contract in lieu of future renewal commissions upon termination of the agency contract; both cases clearly involved an express sale.

> Where we have upheld a taxpayer's claim that there was
> a sale of assets, the agreement at issue expressly
> referred to the transaction as a sale, and an abundance
> of evidence demonstrated the existence of vendible
> tangible assets, as well as vendible goodwill in the
> form of insurance expirations. * * *

Erickson v. Commissioner, T.C. Memo. 1992-585, affd. without published opinion 1 F.3d 1231 (1st Cir. 1993). Here, the evidence does not support a finding of a sale of assets of a business. The record clearly shows that there was no express sales agreement, nor was there any evidence of vendible business assets. Thus, we conclude that petitioners have failed to satisfy their burden of proof that the "extended earnings" constitute gain from the sale or exchange of capital assets. Having resolved the capital asset issue, we must now address whether the extended earnings payments that petitioner received

during the years in issue represent self-employment income within the meaning of section 1402.  For the following reasons we hold that they do.

Section 1401 imposes a tax "on the self-employment income of every individual".  Self-employment income is defined in section 1402 to mean "the net earnings from self-employment derived by an individual * * * during any taxable year".  Sec. 1402(b).  Section 1402(a) defines "net earnings from self-employment" to mean "the gross income derived by an individual from any trade or business carried on by such individual, less the deductions allowed by this subtitle which are attributable to such trade or business".

In Newberry v. Commissioner, 76 T.C. 441, 444 (1981), this Court held that, for income to be taxable as self-employment income, "there must be a nexus between the income received and a trade or business that is, or was, actually carried on."  Under the Court's interpretation of the "nexus" standard, "any income must arise from some actual (whether present, past, or future) income-producing activity of the taxpayer before such income becomes subject to * * * self-employment taxes".  Id. at 446.  Section 1.1402(a)-1(c), Income Tax Regs., provides that, where the required nexus exists, payments may be subject to self-employment tax even when they are attributable in whole or in part to services rendered in a prior taxable year.  See also

Dacey v. Commissioner, T.C. Memo. 1992-187; Rev. Rul. 68-498,
1968-2 C.B. 377.

The issue of whether an independent insurance agent's
"extended earnings" are subject to self-employment tax was most
recently addressed by this Court in Koszewa v. Commissioner, T.C.
Memo. 1994-458. In Koszewa, the taxpayer signed the same "Career
Agent's Agreement" with the same Companies as petitioner. In
Koszewa, we concluded that there was a sufficient nexus between
the extended earnings payments received by the taxpayer and the
trade or business activity in which he was engaged while
associated with the Companies. Thus, the extended earnings
received by the taxpayer in Koszewa were subject to the self-
employment tax.

Applying the Newberry nexus standard and the reasoning used
in Koszewa to petitioner, we conclude that the extended earnings
payments received by him during 1989, 1990, and 1991 related to
the trade or business activity in which he was engaged while
associated with the Companies. First, to qualify for such
payments, petitioner had to be associated with the Companies for
a certain number of years, have a certain number of policies in
place at the time of termination, and refrain from direct compe-
tition with the Companies. All of those requirements relate to
petitioner's original business with the Companies. Second, the
amount of such payments was calculated by reference to the
renewal commissions that petitioner earned in his final months

with the Companies, a criterion obviously tied to petitioner's services with the Companies.  Finally, the agreement which provided for such payments stated that petitioner was to be considered "an independent contractor for all purposes and in all situations".  We find the extended earnings payments were clearly received in respect of a prior "'trade or business * * * actually carried on'" by petitioner.  Koszewa v. Commissioner, supra (quoting Newberry v. Commissioner, supra at 444).  Thus, the extended earnings received by petitioner are subject to self-employment tax on the grounds that they were from a trade or business carried on by petitioner within the meaning of section 1402.  See also Dunn v. Commissioner, T.C. Memo. 1994-414; Erickson v. Commissioner, supra.

Petitioners rely on the Court of Appeals for the Ninth Circuit's reversal of the Tax Court in Milligan v. Commissioner, 38 F.3d 1094 (9th Cir. 1994), revg. T.C. Memo. 1992-655.  In Milligan, the taxpayer was an independent contractor who sold State Farm Insurance policies for over 30 years.  The taxpayer's contract with State Farm provided that, upon termination, an agent who had 2 or more years of service with the company would receive "termination payments" for 5 years following termination.  Id. at 1096.  The amount of the payments for the first post-termination year depended on the income generated by the agent during 12 months prior to termination.  Id.  For the subsequent 4 years, the payments were based on a fraction of the amount

payable in the first post-termination year, less commission charge-backs.  None of the termination payments depended on the length of the taxpayer's service for State Farm and his overall earnings.  Id.  In Milligan, we rejected the taxpayer's contention that the termination payments represented payment for the sale of the taxpayer's insurance business and held that the "termination payments" were subject to self-employment tax. Milligan v. Commissioner T.C. Memo. 1992-655.  We found that there was a sufficient nexus between the income received and the taxpayer's trade or business to render the payments self-employment income.  Id.

The Court of Appeals acknowledged that in order for Mr. Milligan to receive termination payments, he had to have worked for State Farm as an independent contractor for 2 years or more.  Milligan v. Commissioner, 38 F.3d at 1098.  The court stated, however, that this fact by itself did not create a close enough nexus to establish that the termination payments were derived from Mr. Milligan's prior business activity within the meaning of the self-employment tax.  Id.  The Court of Appeals concluded that Mr. Milligan already had been fully compensated for his services and that his business activity was not the "source" of the termination payments.  Id. at 1099.

We conclude that this case is distinguishable on its facts from Milligan due to substantial differences that exist between

petitioner's payments herein and the payments at issue in Milligan.

The Court of Appeals in Milligan v. Commissioner, supra at 1098, found that "To be taxable as self-employment income, earnings must be tied to the quantity or quality of the taxpayer's prior labor, rather than the mere fact that the taxpayer worked or works for the payor." Here, both the quantity and quality of petitioner's labor directly affected the amount of his extended earnings payments.

Unlike the termination payments to the taxpayer in Milligan, petitioner's extended earnings were based in part on how long he had been in service for the Companies. The percentage of petitioner's renewal service fees which would be paid to him as "extended earnings" was determined by how many years he had served as an agent to the Companies. To qualify for the lowest percentage of "extended earnings" petitioner had to have represented the Companies for at least 5 years. Additionally, petitioner had to have 400 or more American Family mutual casualty fire and health policies in force and at least 50 American Standard policies in force at the time the Agreement was terminated in order to qualify for extended earnings. Thus, the extended earning payments received by petitioner were tied to the quantity, quality, and duration of his prior labor.

Another distinction is that the termination payments in Milligan v. Commisisoner, supra at 1099:

did not depend upon the level of Milligan's prior business activity because the Termination Payments were subject to two adjustments <u>unrelated</u> to any business activity on Milligan's part for State Farm. The State Farm companies adjusted the Termination Payments to reflect the amount of income received on Milligan's book of business during the first post-termination year, and the number of his personally-produced policies cancelled during that year. If all of Milligan's customers had cancelled their State Farm non-life policies during the first post-termination year, then Milligan would have received nothing. The adjusted payment amount depended <u>not</u> upon Milligan's past business activity, but upon the successor agent's future business efforts to retain Milligan's customers and to generate service compensation for State Farm. * * *

<u>Milligan v. Commisisoner</u>, <u>supra</u> at 1099. Petitioner's extended earnings were based on renewal service fees paid to him during the final months preceding the Agreement's termination. No adjustment was made, as in <u>Milligan</u>, to reflect income or cancellations during any post-termination year.

In that respect, unlike the situation in <u>Milligan v. Commissioner</u>, <u>supra</u>, the extended earnings received by petitioner were not paid as a consequence of some factor unrelated to petitioner's prior business activity as an insurance salesman. The extended earnings depended upon the amount of renewal commissions earned by petitioner in the last months prior to termination, the length of petitioner's service, and the level of petitioner's prior business activity. We find that there is a "nexus between the income received and a trade or business that is, or was, actually carried on", within the meaning of <u>Newberry v. Commissioner</u>, 76 T.C. at 444. Thus, the extended earnings

received by petitioner are subject to self-employment tax on the grounds that they were derived by petitioner from a trade or business carried on by petitioner within the meaning of section 1402.

For the foregoing reasons, we hold that the "extended earnings" received by petitioner, in the amounts stipulated, are subject to self-employment tax under sections 1401 and 1402.

<u>Decision will be entered</u>

<u>for respondent</u>.