T.C. Summary Opinion 2020-10

UNITED STATES TAX COURT

JAMES H. DUNLAP AND EILEEN M. DUNLAP, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 5811-17S.                    Filed February 18, 2020.

James H. Dunlap and Eileen M. Dunlap, pro sese.

<u>Amy Chang</u> and <u>Gregory Michael Hahn</u>, for respondent.

SUMMARY OPINION

GERBER, <u>Judge</u>:  This case was heard pursuant to the provisions of section

7463 of the Internal Revenue Code in effect when the petition was filed.[1]

---

[1]Unless otherwise indicated, all section references are to the Internal
Revenue Code in effect at all relevant times.

Pursuant to section 7463(b), the decision to be entered is not reviewable by any other court, and this opinion shall not be treated as precedent for any other case.

Respondent determined income tax deficiencies of $14,181 and $14,096 for petitioners' 2014 and 2015 tax years, respectively. The sole issue for our consideration is whether payments received by petitioner Eileen Dunlap are subject to self-employment tax.

Background

When their petition was timely filed, petitioners resided in Washington State. Ms. Dunlap received $115,260.96 in payments from Mary Kay Cosmetics, Inc. (Mary Kay), during each of 2014 and 2015. Mary Kay issued Form 1099-MISC, Miscellaneous Income, to her for each year designating the income as nonemployee compensation. She reported the payments as "Other Income". Respondent's determination that the payments were also subject to self-employment tax gave rise to the tax deficiencies for 2014 and 2015.

Ms. Dunlap began her career with Mary Kay, a manufacturer and seller of cosmetics and related products, as a beauty consultant. Mary Kay consultants are independent contractors and are not employees. Initially, she conducted skin care classes in order to sell Mary Kay products. Any products she sold were purchased at wholesale and sold at retail. She received commissions and bonuses from Mary

Kay for the products sold based on the volume of product purchases from Mary Kay: the larger the volume of purchases, the higher the percentage of commissions and bonuses. Mary Kay's remuneration approach with consultants and directors is designed to be an incentive commission and bonus program.

Ms. Dunlap became a Mary Kay sales director during 1981. Once sales skills are acquired, a beauty consultant can take the next step, which is to recruit and train others to sell Mary Kay products. The sales directors make commissions on the sales of the Mary Kay beauty consultants who work under their guidance. Mary Kay encourages this approach to exponentially expand the company's sales by providing incentives to motivate sales directors to continually expand their tiers of business. Mary Kay would make monthly payments to its independent contractors, and no taxes were withheld from the payments. If one of Ms. Dunlap's beauty consultants decided to no longer sell the products and returned them to Mary Kay, a reduction would be made to her monthly payment to account for the returned products.

As a sales director, Ms. Dunlap had a written agreement with Mary Kay that set forth her duties, rights, and commission structure. She did not have a written agreement with the consultants that she recruited. The recruited consultants had agreements with Mary Kay.

A sales director can achieve the next level, national sales director, and in that position would be involved with a third tier of business. In order to achieve that level Ms. Dunlap was required to recruit a certain number of sales directors. National sales directors have sales directors and consultants in their tiered operation but have no direct authority over them. Mary Kay decided the terms of the relationship between national sales directors, sales directors, and consultants. Each person's contractual agreement was between her and Mary Kay. The terms of the agreements were "dictated" by Mary Kay, and either consultants or sales directors agreed or there was no relationship. The relationship between Mary Kay and national sales directors, sales directors, and consultants was not that of employer-employee.

Once she became a national sales director, Ms. Dunlap could participate in the Family Security Program (FSP). Mary Kay consultants and sales directors were not entitled to participate in the FSP. The benefit of the FSP was that it provided a national sales director with financial security should she retire or be unable to work. Under the FSP, at 65 years of age, Ms. Dunlap's relationship with Mary Kay and any payments for sales or commissions from Mary Kay would end. At 65 she was eligible to receive FSP payments, but she could no longer be involved in a tiered business relationship under Mary Kay. In other words her

business relationship with Mary Kay terminated, but under the FSP she or her estate would receive 15 years of payments based on her high average tiered sales activity. The terms of the FSP are set by Mary Kay, and there is no negotiation of the FSP terms.

Ms. Dunlap became a national sales director during 1988, around the time that Mary Kay began the FSP. Mary Kay established the FSP as a retirement program for national sales directors. The FSP agreement required 15 years of national sales directorship and attainment of the age of 65. She attained that age with sufficient years of service allowing her to receive FSP payments beginning in January 2006. Under the agreement she was entitled to 60% of her final average of commissions during her last 15 years of service. The FSP agreement stated that she was not an employee of Mary Kay.

A preamble to a July 1, 1991, FSP restatement specifically prepared for Ms. Dunlap states that her participation in the program is in recognition of her "valuable contribution" as a national sales director. It further states:

> [E]ach National Sales Director desires to participate in this program in exchange for the offer by Mary Kay Cosmetics, Inc. to acquire at retirement the valuable goodwill and all other rights associated with the business, including future goodwill generated by her continued support and loyalty to Mary Kay Cosmetics, Inc.

Any election under the program was irrevocable. Payments under the plan were based on the high average tiered sales activity for a prescribed period. Ms. Dunlap had a "normal" retirement under the FSP, which means that she had attained age 65. The payment amounts under the FSP were fixed based on her Mary Kay business activity, and resulted from her efforts and services before retirement. The payments did not represent income that had previously been reported as gross income or subjected to self-employment tax.

The FSP plan was funded on the basis of a contractual obligation of Mary Kay from the general assets of the firm. FSP participants do not acquire any interest greater than an unsecured creditor's. The FSP board appointed by the company was empowered to "amend, modify or terminate the Plan at any time and in any manner." If it were terminated, national sales directors who are being paid under the plan would be paid as scheduled in accord with the plan. The plan is construed in accord with the law of the State of Texas.

A July 1, 2001, restatement of the FSP plan stated: "The Plan is intended to be a non-qualified deferred compensation arrangement and is not intended to meet the requirements of Section 401(a) of the [Internal Revenue] Code. The Plan is intended to meet the requirements of Section 409A of the Code and shall be construed and interpreted in accordance with such intent."

In December 2008 an addendum restating the FSP plan became effective. The central document of the addendum, dated July 1, 2005, applied to individuals who were national sales directors on December 31, 1987, including Ms. Dunlap. The addendum's preamble expressed, in similar terms as older versions, Mary Kay's motivation for establishing the FSP, including the reference to goodwill. The addendum stated that the plan was intended to be a nonqualified deferred compensation arrangement and not intended to meet the requirements of section 401(a). It further stated that the plan was intended to meet the requirements of section 409A.

In an October 25, 1995, letter to national sales directors, Mary Kay advised that the receipt of FSP payments would not reduce any Social Security benefits to which the participants might be entitled. On September 26, 2008, the FSP was amended to comply with changes in the Internal Revenue Code. Mary Kay advised that changes to section 409A "are likely" applicable to the FSP. Mary Kay characterized section 409A as generally providing "that unless specified requirements are met, all amounts deferred under a nonqualified deferred compensation plan * * * are subject to taxation." In the opinion of Mary Kay management the FSP came within the provisions of section 409A. In particular the amendments to section 409A were, as per Mary Kay, to affect the start date of

FSP payments. The materials sent to national sales directors reiterated that the FSP was intended to be a nonqualified deferred compensation arrangement and not intended to meet the requirements of section 401(a).

Petitioner remained retired during 2014 and 2015 and did not have a trade or business during those years. It was the opinion of Mary Kay, as expressed to national sales directors on October 25, 1995, that FSP payments were subject to self-employment tax when paid to a retired national sales director.

## Discussion

The question under consideration is whether payments Ms. Dunlap received from Mary Kay during 2014 and 2015 are subject to self-employment tax. Respondent relies heavily on Peterson v. Commissioner, 827 F.3d 968 (11th Cir. 2016), aff'g T.C. Memo. 2013-271. Petitioners' primary argument is that Ms. Dunlap sold her business or goodwill to Mary Kay and that the FSP payments were for the sale of a capital asset. They further argue that Peterson was affirmed by the Circuit Court of Appeals for the Eleventh Circuit and that she resides in Washington State where any appeal would be to the Court of Appeals for the Ninth Circuit. Petitioners also make several arguments relying on statutes and regulations, each of which are considered in this opinion. Finally, per the parties' stipulation, the payments "are deferred compensation payments from Mary Kay

paid pursuant to a non-qualified deferred compensation non-account balance plan described in either Treas. Reg. section 1.409A-1(c)(2)(i)(C)(1) or (2)."

The Statutes. Section 409A provides for the inclusion in gross income of deferred compensation from a nonqualified deferred compensation plan. The parties disagree about the application of section 1.409A-1(c)(2)(i)(C), Income Tax Regs., to the Mary Kay FSP payments. The regulation contains definitions and further explains which plans come within the purview of section 409A. Petitioners favor subdivision (i)(C)(1) and respondent subdivision (i)(C)(2) of section 1.409A-1(c)(2), Income Tax Regs. The parties agree that the Mary Kay plan was a nonaccount balance plan. The regulation contains alternative definitions for the term "nonaccount balance plan". Subdivision (i)(C)(1) refers to a situation where the recipient was an employee of the company making the deferred payments. Subdivision (i)(C)(2) refers to a situation where the recipient was an independent contractor, such as Ms. Dunlap. We can only speculate that Ms. Dunlap chose subdivision (i)(C)(1) because it contains a reference to section 31.3121(v)(2)-1(c)(2)(i) and (1)(iii)(B), Employment Tax Regs., which she relies on in one of her arguments. See infra p. 16.

The other applicable statutes are sections 1401 and 1402, which provide for the imposition of self-employment tax and definitions, respectively. Section

1.1402(a)-1, Income Tax Regs., provides additional definitions and detail of earnings from self-employment. Section 1.1402(a)-1(c), Income Tax Regs., provides:

> Gross income derived by an individual from a trade or business includes gross income received (in the case of an individual reporting income on the cash receipts and disbursements method) or accrued (in the case of an individual reporting income on the accrual method) in the taxable year from a trade or business even though such income may be attributable in whole or in part to services rendered or other acts performed in a prior taxable year as to which the individual was not subject to the tax on self-employment income.

This definition places Mary Kay's FSP payments to Ms. Dunlap clearly within the statutory framework for income that is subject to self-employment tax. Ms. Dunlap, however, makes several additional arguments, which are addressed for completeness.

Case Precedents. The focal point of respondent's position is Peterson, the facts of which are in all important respects the same as those we consider in petitioners' case. Mrs. Peterson was a national sales director who entered into an FSP agreement with Mary Kay and received payments that the Commissioner determined were subject to self-employment tax. Mrs. Peterson, like Ms. Dunlap, argued that the FSP payments were made in exchange for the sale of her Mary Kay business back to Mary Kay. There are two differences in the facts of these cases:

(1) Mrs. Peterson retired during 2009 and Ms. Dunlap retired during 2006 and

(2) the Court of Appeals for the Eleventh Circuit affirmed this Court's opinion in

Peterson whereas Ms. Dunlap resided in the Ninth Circuit when the petition was

filed. See Golsen v. Commissioner, 54 T.C. 742 (1970), aff'd, 445 F.2d 985 (10th

Cir. 1971).

In Peterson v. Commissioner, T.C. Memo. 2013-271, this Court decided that

the FSP payments were subject to self-employment tax. In pertinent part the Court

explained:

> Section 1401 imposes a tax on a taxpayer's self-employment
> income. Self-employment income consists of gross income derived
> by an individual from any trade or business carried on by that
> individual. See sec. 1402(a) and (b). Mrs. Peterson formerly carried
> on a trade or business. Therefore, Mary Kay's 2009 distributions
> pursuant to the FSP * * * agreements are subject to self-employment
> tax if they were "derived" from Mrs. Peterson's business (i.e., "'tied
> to the quantity or quality of * * * [her] prior labor'"). See Jackson v.
> Commissioner, 108 T.C. 130, 135-136 (1997) (quoting Milligan v.
> Commissioner, 38 F.3d 1094, 1098 (9th Cir. 1994), rev'g T.C. Memo.
> 1992-655). The Mary Kay distributions were "tied to" the quantity
> and quality of Mrs. Peterson's prior labor. See id. Pursuant to the
> FSP agreement, Mrs. Peterson's distributions were based on her
> average commissions over the five years prior to her retirement. * * *
> In addition, Mary Kay's distributions pursuant to both plans were
> based on Mrs. Peterson's age at retirement and minimum years of
> service. Moreover, the FSP * * * agreements expressly provided that
> the distributions were deferred compensation (i.e., related to Mrs.
> Peterson's prior labor). Petitioners failed to adduce proof sufficient
> to alter the construction of these unambiguous agreements or show
> that they were unenforceable. See Plante v. Commissioner, 168 F.3d

1279, 1280-1281 (11th Cir. 1999), aff'g T.C. Memo. 1997-386; Commissioner v. Danielson, 378 F.2d 771, 775 (3d Cir. 1967), vacating and remanding 44 T.C. 549 (1965). Accordingly, the 2009 FSP * * * distributions are subject to self-employment tax pursuant to section 1401. [Id. at *8-*9.]

In Peterson the Court of Appeals for the Eleventh Circuit affirmed this Court's ruling that the 2009 Mary Kay FSP payments were subject to self-employment tax. The Court of Appeals' opinion detailed all of the information that the parties in that case had established in the lower Court record. Those details are, with limited and insignificant exceptions, the same as are included in the record of petitioners' case. The Court of Appeals employed the holding in Commissioner v. Danielson, 378 F.2d at 775, to decide that Mrs. Peterson had not shown that the documentary designation of the payments as deferred compensation by Mary Kay was incorrect.

The Court of Appeals explained the rule in Danielson as follows:

> When a taxpayer characterizes a transaction in a certain form, the Commissioner may bind the taxpayer to that form for tax purposes. This is the rule: "a party can challenge the tax consequences of his agreement as construed by the Commissioner only by adducing proof which in an action between the parties [to the agreement] would be admissible to alter that construction or to show its unenforceability because of mistake, undue influence, fraud, duress, et cetera." [Peterson v. Commissioner, 827 F.3d at 987 (quoting Plante v. Commissioner, 168 F.3d at 1280-1281).]

The fact that Ms. Dunlap and Mrs. Peterson were both national sales directors and contemporaries in the Mary Kay business under the same agreements and terms presents Ms. Dunlap with a difficult burden to show that the result in her case should not be the same. Her basic argument is that she resides in the Ninth Circuit and that she is not bound by the Court of Appeals for the Eleventh Circuit's holding. Ms. Dunlap, however, overlooks the fact that this Court is a court of national jurisdiction and our holdings would be applied equally to all taxpayers, unless they reside in a State where the Court of Appeals for that circuit has held otherwise in a decision "which is squarely in point". Golsen v. Commissioner, 54 T.C. at 757.

In an attempt to show that the result in the Court of Appeals for the Ninth Circuit would be different, petitioners cite Milligan v. Commissioner 38 F.3d 1094 (9th Cir. 1994), rev'g T.C. Memo. 1992- 655. That case involved self-employment tax determined by the Commissioner for an insurance agent's termination payments. Mr. Milligan had been an insurance agent from 1949 until he retired in 1983 at age 62. Upon retirement the insurance company made "termination" payments to him that were based on a complex formula contained in a termination agreement.

The Court of Appeals for the Ninth Circuit, in reversing this Court's decision, held:

> We are not prepared to characterize the precise relationship between the Termination Payments and Milligan's prior business activity. Ambiguities in the Agent's Agreement prevent us from doing so. But, despite the ambiguities, we can see that the Termination Payments did not "derive" from Milligan's prior business activity within the meaning of the self-employment tax. To be taxable as self-employment income, earnings must be tied to the quantity or quality of the taxpayer's prior labor, rather than the mere fact that the taxpayer worked or works for the payor. [Id. at 1098; fn. ref. omitted.]

Initially, we note that the Mary Kay documents and agreements are not ambiguous on this point. Applying the "quantity or quality" reasoning to petitioners' facts, we continue to conclude that the payments Ms. Dunlap received during 2014 and 2015 are subject to self-employment tax. In the Ninth Circuit Ms. Dunlap is not bound by the Danielson rule, and she may present evidence to show that the substance of her relationship with Mary Kay, as opposed to Mrs. Peterson's, was different from the form set forth in the agreements. The record here shows that the FSP agreement characterizes the payments as deferred compensation, which she has stipulated and therefore conceded. Moreover, the payments were calculated and derived on the basis of her prior work and income activity with Mary Kay and are, unlike those in Milligan, tied to the quantity and

quality of that service. In this case Ms. Dunlap receives a fixed payment for 15 years based on her prior sales and commissions. Accordingly, the FSP payments were fixed on the basis of prior business activity. Finally, petitioners have not shown that the record contradicts the terminology in the documents and agreements.

Sale of Goodwill. Petitioners argue that, in effect, Ms. Dunlap sold the goodwill of her trade or business to Mary Kay. The argument derives from some of the preamble text in various agreement documents concerning the FSP program. The following text is in the preamble to the July 1, 1991, Mary Kay FSP agreement: "[E]ach National Sales Director desires to participate in this program in exchange for the offer by Mary Kay Cosmetics, Inc. to acquire at retirement the valuable goodwill and all other rights associated with the business, including future goodwill generated by her continued support and loyalty to Mary Kay Cosmetics, Inc."

Petitioners contends that the above text is evidence that Mary Kay FSP payments were made in exchange for Ms. Dunlap's business and/or goodwill. They further argue that Ms. Dunlap should be entitled to capital gains tax rates on the income. On the 2014 and 2015 returns, however, she reported the payments as ordinary income.

The facts here belie petitioners' sale argument. There was no agreement between Mary Kay and Ms. Dunlap with respect to any sale of a business or goodwill. Other than the reference to goodwill in the preamble to some documents, there is no evidence in the record that would support a sale of a business interest. The payments under the FSP are calculated on the basis of sales and commissions and are being paid at a rate of 60% of a high average tiered sales activity. Lastly, Ms. Dunlap had no rights or legal relationship with the consultants and sales directors in her tiered Mary Kay activity. Accordingly, her goodwill argument does not change the outcome of this case.

Deferred Compensation Plan. Petitioners make several technical arguments that the FSP is not, in reality, a deferred compensation plan. They make this argument even though the parties stipulated that Ms. Dunlap received "deferred compensation payments from Mary Kay paid pursuant to a nonqualified deferred compensation non-account balance plan." The basis for their position appears based in reliance on section 31.3121(v)(2)-1(c)(2)(i) and (1)(iii)(B), Employment Tax Regs., which is referenced in section 1.409A-1(c)(2)(i)(C)(1), Income Tax Regs. As we have already explained, in order for Ms. Dunlap to come within subdivision (i)(C)(1) of that regulation, she would have to have been an employee of Mary Kay. As part of her reasoning she points out that there was no tax

withholding from Mary Kay income before her retirement. She also notes that some of her income was attributable to the efforts of others, i.e., consultants and sales directors within her tiers as a national sales director. From these postulations, she concludes that there must be a present value calculation to determine the amount includible for 2014 and 2015. Using this line of reasoning, she ultimately calculated that her present value annual self-employment tax would be $702. Ms. Dunlap's approach depends several premises which are not founded in the record or law.

The record is clear that Ms. Dunlap's prior earnings were the basis for the annual FSP payments and that the quantity and quality of her labor were the reason for the postretirement payments. In addition her FSP payments were not subject to postretirement adjustments and were fixed on the basis of her prior labor. Finally, the payments had not previously been reported as income or subjected to self-employment tax. Stated another way, the FSP payments are being paid contemporaneously although they were earned in prior years.

To reflect the foregoing,

<u>Decision will be entered for</u>

<u>respondent</u>.