T.C. Memo. 1997-284


UNITED STATES TAX COURT


JAMES J. LENCKE AND JANENE B. LENCKE, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 8787-95.                    Filed June 24, 1997.


<u>Margret G. Robb</u> and <u>Suzanne C. Klinghammer</u>, for
petitioners.

<u>Angela J. Kennedy</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

DAWSON, <u>Judge</u>:[1]  Respondent determined deficiencies in
petitioners' Federal income taxes and penalties for the taxable
years 1990, 1991, and 1992 as follows:

---

[1]  With the consent of counsel for the parties, the Chief
Judge reassigned this case, after the death of Judge Irene F.
Scott, to Judge Howard A. Dawson, Jr., for disposition on the
existing record.

| Year | Deficiency | Accuracy-Related Penalties - Sec. 6662(a)[2] | |
| --- | --- | --- | --- |
| | | Sec. 6662(b)(1) | Sec. 6662(b)(2) |
| 1990 | $14,753 | --- | $2,815 |
| 1991 | 4,195 | $839 | --- |
| 1992 | 3,956 | 791 | --- |

Several issues have been conceded or settled by the parties. The issues presented for decision are: (1) Whether petitioners are entitled to claimed losses incurred in their model railroad activity for 1990, 1991, and 1992, so as to allow the expenses in excess of the income from the activity to be deducted for Federal income tax purposes; (2) whether petitioners are entitled to a nonbusiness bad debt deduction for 1990; (3) whether amounts received by petitioner James J. Lencke as residual insurance premiums and in lieu of renewal insurance commissions during 1990 and 1991 are subject to self-employment tax under sections 1401 and 1402; (4) whether petitioners are liable for an accuracy-related penalty for an underpayment of tax attributable to a substantial understatement for 1990; and (5) whether petitioners are liable for accuracy-related penalties for negligence or disregard of rules or regulations for 1991 and 1992.

## FINDINGS OF FACT

Some of the facts have been stipulated and are found accordingly. The stipulation of facts and three supplemental

---

[2] All section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure, unless otherwise indicated.

stipulations of facts, together with attached exhibits, are incorporated herein by this reference.

At the time they filed their petition in this case, James J. Lencke and Janene B. Lencke (petitioners) were residents of Lafayette, Indiana. They timely filed their joint Federal income tax returns for the taxable years 1990, 1991 and 1992.

Claimed Business Loss Deductions for Model Railroad Activity

James J. Lencke (Mr. Lencke) has been collecting model railroad equipment and memorabilia for over 50 years. His model railroad collection is elaborately displayed in the basement of his home. It includes a complete circus with a big top, 12 operating carnival rides, 12 complete circus trains, hundreds of buildings, signals, lights, and figurines, and at least 800 locomotives, 3,000 freight cars, and 2,000 passenger cars. Mr. Lencke is very knowledgeable about model railroads.

Because Mr. Lencke had become disabled in July 1989, and needed an activity to occupy his mind and his time, petitioners started a model railroad activity, called Red Caboose, operated from their home in 1990. Both Mr. Lencke and Janene B. Lencke (Mrs. Lencke), participated in the activity during the years in issue, and both were still engaged in the activity at the time this case was tried.

Before deciding to begin their operation of Red Caboose, petitioners visited model railroad shows and sought advice from various vendors of model railroad supplies. Although they

considered entering into other types of activities, such as a craft activity, petitioners chose the model railroad activity because they believed it would be a feasible activity for them to pursue given Mr. Lencke's extensive model railroad knowledge and his physical limitations.[3]

Prior to forming Red Caboose, petitioners had a retail merchant certificate for one of their former activities, a craft activity called Kiln Classics. In early 1990, they attempted to have the name Red Caboose substituted for the name Kiln Classics on their retail merchant certificate. However, the name was not changed by the State of Indiana until several years later. Petitioners are not zoned to conduct a retail business in their home.

During 1990, after petitioners had selected Red Caboose as the activity they would conduct, they asked various suppliers whether they would sell model railroad merchandise to them at wholesale prices. However, the suppliers refused to do so until sometime in 1991. Petitioners also contacted credit card companies, Visa and MasterCard, to discuss the possibility of Red Caboose accepting their credit cards for its model railroad

---

[3] During the years in issue, Mr. Lencke suffered from glaucoma and diabetes, and previously he had had open heart surgery. In addition, he is deaf in one ear, completely blind in one eye and partially blind in the other eye, and must keep one of his legs in a cast. Thus, Mrs. Lencke, along with Mr. Lencke's brother, does most of the physical work involved in the operation of Red Caboose, and Mr. Lencke does most of the paperwork.

orders. Visa and MasterCard would not allow Red Caboose to accept their credit cards during the years in issue.

While planning the activities to be pursued through Red Caboose, Mr. Lencke looked through model railroad magazines to find model railroad shows which would be convenient and feasible for them to attend. He investigated the cost to rent tables at the shows for petitioners to display and sell their merchandise, and he made arrangements for them to become vendors at the shows. Furthermore, petitioners advertised Red Caboose in model railroad and toy magazines, and, in 1991, they published a two-page flyer describing Red Caboose and listing its merchandise. The flyer was distributed at model railroad shows. They also created Red Caboose business cards during 1990, and used the elaborate model railroad display in their basement as a way to entice visitors' interests in collecting model railroads.[4] However, they did not formulate a written business plan for Red Caboose.

During the years in issue, petitioners did not maintain a separate telephone line at their home for Red Caboose. Their home telephone number was not listed in the local telephone directory and, although it was listed on the business cards they distributed, it was not provided in either their advertisements

---

[4] Mr. Lencke treated visitors to his house to tours of the model railroad collection in his basement. Although he did not charge a fee for the tours, he encouraged "donations" by placing a "donations bucket" near his collection. Some visitors donated as much as $20.

in the train and toy magazines or the two-page flyer distributed to their customers. Thus, petitioners primarily conducted a mail-order model railroad activity from their home. They used the model railroad shows they attended as a way to attract mail-order customers.

During 1990, 1991, and 1992, petitioners attended 4, 13, and 24 model railroad shows, respectively. The number of tables they rented at the shows increased during that time.

During a week in which petitioners were not preparing to travel to a show, they surveyed their inventory, which was stored in their two-car garage and in a 24- by 30-foot shed adjacent to their house, to assess which items sold well, which items needed to be reordered, and which items needed to be marked down.[5] They also discussed whether each railroad show they attended was worthwhile, and processed orders from their mail-order customers.

During a week in which petitioners were preparing for a show, they made sure they had all the merchandise they would need for the show. After marking a price on each of the items, they packed the merchandise in their truck to take it to the show. Each item's price was generally based on the price for which the item was advertised in model railroad magazines. However, if they realized that another vendor at a show was selling an item

---

[5] At its inception Red Caboose's merchandise consisted of cardboard signs imprinted with train logos, 50 different railroads, and mugs and buttons. Red Caboose's merchandise expanded during the years in issue.

for less than the price petitioners had marked on the item, they adjusted that item's price accordingly. None of their merchandise was sold below cost.

Usually, petitioners left on Friday morning when they were going to a Saturday show. Once they arrived at the show, they unloaded the merchandise and set up their tables. The shows were generally held on Saturday and Sunday and lasted 7 hours each day. On Sunday evening they packed the merchandise that was not sold into their truck and returned home.

Petitioners did not hire an accountant to assist with the preparation of Red Caboose's books and records. They did not have a traditional bookkeeping system for the activity. Red Caboose's records were kept in the same way Mr. Lencke had previously kept his insurance business records. To keep track of merchandise sold during a show, petitioners dictated descriptions of the items sold into a hand-held tape recorder. Once they returned home, they listened to the tape and made a note of the amount of money received and the items sold at each show. During 1990 and 1991, petitioners recorded the amount and nature of Red Caboose's sales in their personal appointment book. During 1992, they prepared a tally sheet for each show indicating which items were sold and the amount of money received at each show.[6]

---

[6] Petitioners testified that Red Caboose's sales were recorded in their personal ledger during the years in issue. However, the stipulation of facts to which the parties agreed
(continued...)

Petitioners placed the receipts for Red Caboose's expenses, along with some of the receipts for their personal expenses, in manilla envelopes, but the receipts were not labeled personal or business.  At the end of each year, working from memory, they prepared a list of Red Caboose's expenses and attached the list to the outside of the envelopes.  Petitioners could not have presented a complete set of records for Red Caboose, separate from their personal records, at any point during the years in issue.

Mr Lencke deposited some of the proceeds from Red Caboose into his Tippecanoe Agency account at Valley Federal Bank, which was the account he had maintained as an insurance agent with United Farm Bureau Insurance Companies.  The account no longer contained funds from his former business as an insurance agent when the Red Caboose proceeds were deposited.  Mr. Lencke's Social Security benefits were also deposited into the Tippecanoe Agency account during the years in issue.  In fact, petitioners used some of Mr. Lencke's Social Security benefits to fund Red Caboose.  In addition, petitioners paid some of Red Caboose's expenses with funds from their personal bank account.

---

[6](...continued)
indicated that for 1990 and 1991 the sales were recorded in their appointment book, and for 1992 the sales were recorded on a separate tally sheet for each show.  We have resolved this inconsistency by finding that for 1990 and 1991 the sales were recorded in their personal appointment book, and for 1992 the sales were recorded on a separate tally sheet for each show.

In connection with Red Caboose, petitioners incurred, among other operating expenses, table rental fees, postage expenses, advertising expenses, utility expenses, banking fees, and travel expenses. However, other than staying at less expensive hotels and eating at less expensive restaurants while they were attending shows, petitioners were unable to reduce their operating expenses during the years in issue.

Petitioners enjoyed their model railroad activity and never considered abandoning it although they regularly incurred losses. While attending the model railroad shows, they occasionally purchased items from other vendors, but they did not sell any part of Mr. Lencke's personal model railroad collection in connection with their model railroad activity.

On line 17 of their joint Federal income tax returns for 1990, 1991, and 1992, petitioners reported taxable pension income in the amounts of $71,424, $35,524, and $33,714, respectively.

During 1990, 1991, and 1992, the gross receipts less cost of goods sold from petitioners' model railroad activity were $440, $2,108, and $1,128, respectively. Petitioners claimed losses from the operation of their model railroad activity on the Schedule C attached to their 1990, 1991, and 1992 Federal income tax returns as follows:

|  | 1990 | 1991 | 1992 |
|---|---|---|---|
| Gross Receipts | $1,100 | 5,271 | 13,012 |
| Cost of Goods Sold | - | (364) | (12,590) |
| Gross Income | 1,100 | 4,907 | 422 |

| Operating Expenses | (19,620) | (14,990) | (18,474) |
| | (18,520) | (10,083) | (18,052) |
| Depreciation | (11,298) | (7,828) | (6,006) |
| Income/(Loss) | (29,818) | (17,911) | (24,058) |

Although petitioners' gross income from their model railroad activity increased to $8,577 in 1993, $16,142 in 1994, and $14,575 in 1995, their operating expenses substantially increased, so that their claimed losses were $23,255, $11,656, and $14,443, respectively, for those years.  Thus, the claimed losses for 1990 through 1995 totaled $121,141, and petitioners anticipated no net profit for their model railroad activity in 1996.  Since 1993 petitioners' activity has been operated in the name of Jim's House of Trains because they were informed that the name Red Caboose is a trademark.

In the notice of deficiency respondent determined that petitioners' model railroad activity was not engaged in for profit and therefore disallowed the claimed loss deductions.

Claimed Nonbusiness Bad Debt Deduction

On January 30, 1990, petitioners lent Dale and Gloria Christopher $6,000 to enable them to purchase a flower shop in Monticello, Indiana.  They had known the Christophers for 4 or 5 years prior to lending them the $6,000, and they had become friends through church and other social activities.  At that time both couples lived in Battleground, Indiana, which is a small community with less than 1,000 residents.

On February 14, 1990, the Christophers signed a promissory note obligating them to repay the $6,000 to petitioners, at ten percent interest, in monthly payments of $127.49. On February 9, 1990, the Christophers became the owners of Main Street Floral. The Christophers allowed petitioners to place some candy on consignment at their flower shop.

Petitioners felt that Main Street Floral was not prospering during 1990. They visited the flower shop several times during 1990, and on each visit they noticed very few customers and very little inventory in the shop. Although the Christophers sold the candy petitioners placed on consignment at the flower shop, they told them that they could not pay them their share of the proceeds from the sales.

Petitioners received three checks from the Christophers during 1990, which represented four of the monthly payments required under the terms of the promissory note. However, Mrs. Christopher requested that the checks not be cashed. Nonetheless, in November 1990, petitioners took the checks to the bank to cash them, but were told by the bank teller that the Christophers did not have enough money in their account to cover the checks, and that petitioners should not attempt to cash them. In addition, petitioners heard rumors that the Christophers were experiencing financial problems and had sought help through various local charities. After 1990, petitioners learned that

the Christophers' home was foreclosed, and in 1993 the Christophers filed for divorce.

During December 1990, Mr. Lencke contacted the Christophers to discuss repayment of the $6,000 loan. He was informed that Mr. Christopher was currently "out of work", and the Christophers would therefore not be able to repay the loan. Petitioners then decided not to pursue further collection of the debt.

Mr. Christopher told petitioners that Main Street Floral had been sold by the Christophers in December 1990. However, the Christophers did not enter into a contract to sell the floral shop until January 19, 1991. Main Street Floral was sold for $18,000, and the Christophers received the initial installment in the amount of $3,000 on January 19, 1991. In December 1990, the Christophers informed petitioners that any money they received from the sale of their business would be used to repay their obligation to the bank and would not be used to repay the $6,000 the Christophers owed to petitioners. In March 1994, Mr. Christopher was employed by Wabash National Corporation.

Because of the Christophers' failure to repay petitioners the $6,000 loaned to them, petitioners claimed a nonbusiness bad debt deduction on their 1990 Federal income tax return. In the notice of deficiency respondent disallowed petitioners' claimed bad debt deduction because they failed to establish that the debt became worthless in 1990.

Self-Employment Taxes on Residual and Renewal Insurance
Commissions

From 1973 to July 1989, Mr. Lencke was an insurance agent of
United Farm Bureau Family Life Insurance Company and United Farm
Bureau Mutual Insurance Company (Farm Bureau). He and Farm
Bureau considered their association to be an independent
contractor relationship. While he worked as Farm Bureau's agent,
Mr. Lencke had his own clients, who could not be assigned to a
different agent. He received a 5-percent renewal commission on
the life insurance policies he sold. Throughout his career as an
agent with Farm Bureau, Mr. Lencke maintained his insurance
office in his home. During July 1989, Mr. Lencke became disabled
and decided that he could not continue to work as Farm Bureau's
agent. The relationship was terminated.

In general, when one of its insurance agents becomes
disabled and terminates his or her agency relationship, Farm
Bureau pays the agent a 5-percent renewal commission for a
limited period on the life insurance policies sold by him.
However, Mr. Lencke was concerned that some of his clients would
not renew their Farm Bureau life insurance policies once they
learned that he would no longer be working for Farm Bureau.
Thus, to provide him with a fixed amount of income during the 6
months following his separation from service, and to enable Farm
Bureau to assign his clients to other agents, he and Farm Bureau
agreed, after negotiations, that his previously executed

agreement to sell insurance on behalf of Farm Bureau would be amended.

An Amendment to Contract Between James J. Lencke and United Farm Bureau Family Life Insurance Company, United Farm Bureau Mutual Insurance Company, and Their Subsidiaries (contract amendment), executed in September 1989, provided that Mr. Lencke would not earn any new commissions (other than first writings on policies previously written), and would receive, in lieu of renewal commissions, five monthly payments of $5,000. Petitioner received two of the monthly payments in 1990 which totaled $10,225.

Mr. Lencke also received $874 in residual premiums in 1990, and $684 in residual premiums in 1991. In 1990, Mr. Lencke had premium returns totaling $1,359.

Petitioners reported the amounts Mr. Lencke received as residual premiums in 1990 and 1991 as other income on line 22 of their joint Federal income tax returns for 1990 and 1991, respectively. However, they did not report the $10,225 Mr. Lencke received in lieu of renewal commissions in 1990 as income on their tax return for that year. Petitioners have conceded that the $10,225, less the premium returns for 1990, should have been reported as income on their 1990 return. But they allege in their petition that the residual premiums received by Mr. Lencke in 1990 and 1991, and the amount received by him in lieu of

renewal commissions in 1990, are not subject to self-employment tax.

In the notice of deficiency respondent determined that the amounts Mr. Lencke received as residual premiums and in lieu of renewal commissions constitute income from self-employment within the meaning of section 1401 and, therefore, were subject to self-employment tax.

Accuracy-Related Penalties

Petitioners' Federal income tax returns for 1990, 1991, and 1992 were prepared by an attorney.

Petitioners reported a tax liability of only $392 on their 1990 Federal income tax return. They failed to report net income received in lieu of renewal commissions for 1990. Their tax liability was substantially understated for that year.

Petitioners claimed depreciation deductions on the Schedule C attached to their 1991 and 1992 Federal income tax returns for several items for which they have conceded they were not entitled to depreciation deductions. The items for which petitioners claimed depreciation deductions included a boat, lawn mower, and sprinkler, which were personal assets. They failed to maintain or present adequate substantiation to support some deductions claimed on their tax returns for 1991 and 1992.

Respondent determined in the notice of deficiency that petitioners are liable for accuracy-related penalties under

section 6662(b)(2) for 1990 and section 6662(b)(1) for 1991 and 1992.

OPINION

We begin by noting that respondent's determinations are presumed correct, and petitioners bear the burden of proving that those determinations are erroneous.  Rule 142(a); Welch v. Helvering, 290 U.S. 111 (1933).  Deductions are a matter of legislative grace, and petitioners have the burden of proving that they are entitled to any claimed deductions.  INDOPCO, Inc. v. Commissioner, 503 U.S. 79, 84 (1992).

I.  Claimed Business Loss Deductions for Model Railroad Activity

Section 183[7] provides, in general, that an individual will not be

---

[7] SEC. 183. ACTIVITIES NOT ENGAGED IN FOR PROFIT.
    (a) GENERAL RULE.--In the case of an activity engaged in by an individual or an S corporation, if such activity is not engaged in for profit, no deduction attributable to such activity shall be allowed under this chapter except as provided in this section.
    (b) DEDUCTIONS ALLOWABLE.--In the case of an activity not engaged in for profit to which subsection (a) applies, there shall be allowed--

        (1) the deductions which would be allowable under this chapter for the taxable year without regard to whether or not such activity is engaged in for profit, and

        (2) a deduction equal to the amount of the deductions which would be allowable under this chapter for the taxable year only if such activity were engaged in for profit, but only to the extent that the gross income derived from such activity for the taxable year exceeds the deductions allowable by reason of paragraph (1).

    (c) ACTIVITY NOT ENGAGED IN FOR PROFIT DEFINED.--For purposes of this section, the term "activity not engaged in for profit" means any activity other than one with respect to which deductions are allowable for the taxable year under section 162

(continued...)

allowed a deduction in excess of gross income attributable to an activity if the activity is not engaged in for profit. An activity not engaged in for profit is "any activity other than one with respect to which deductions are allowable for the taxable year under section 162 or under paragraph (1) or (2) of section 212." Sec. 183(c). Therefore, whether an activity is engaged in for profit is determined with reference to sections 162 and 212.

Deductions are allowed under section 162(a) for all ordinary and necessary expenses of carrying on an activity that constitutes a trade or business. The Supreme Court has stated that "to be engaged in a trade or business, the taxpayer must be involved in the activity with continuity and regularity and * * * the taxpayer's primary purpose for engaging in the activity must be for income or profit. A sporadic activity, a hobby, or an amusement diversion does not qualify." Commissioner v. Groetzinger, 480 U.S. 23, 35 (1987). To be entitled to a trade or business expense deduction, the taxpayer must have an "actual and honest objective of making a profit." Dreicer v. Commissioner, 78 T.C. 642, 645 (1982), affd. without opinion 702 F.2d 1205 (D.C. Cir. 1983).

---

[7](...continued)
or under paragraph (1) or (2) of section 212.

Petitioners contend that Red Caboose was an activity in which they engaged with the objective of making a profit during the years in issue. Respondent, on the other hand, contends that petitioners' operation of Red Caboose was an activity "not engaged in for profit" within the meaning of section 183(c).

Whether the required profit objective exists is to be determined on the basis of all the facts and circumstances of each case. Allen v. Commissioner, 72 T.C. 28, 33 (1979). Section 1.183-2(b), Income Tax Regs., sets forth some of the relevant factors to be considered in deciding whether an activity is engaged in for profit. No one factor is controlling. Dunn v. Commissioner, 70 T.C. 715, 720 (1978), affd. 615 F.2d 578 (2d Cir. 1980). The factors include: (1) The manner in which the taxpayer carries on the activity; (2) the expertise of the taxpayer or his advisers; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) the expectation that assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on other similar or dissimilar activities; (6) the taxpayer's history of income or losses with respect to the activity; (7) the amount of occasional profits, if any, which are earned; (8) the financial status of the taxpayer; and (9) whether elements of personal pleasure or recreation are involved. Sec. 1.183-2(b), Income Tax Regs. While the focus of the test is on the subjective intention of the taxpayer, greater weight is given to the objective facts than to

the taxpayer's mere statement of his or her intent.  Dreicer v.
Commissioner, 78 T.C. at 645; sec. 1.183-2(a), Income Tax Regs.

After considering all the facts and circumstances in this
case, it is our view that petitioners' operation of Red Caboose
was an activity not engaged in for profit during the years in
issue.  Some of the more significant factors we have weighed are
the manner in which petitioners carried on Red Caboose, Red
Caboose's loss history, the time and effort expended by them in
carrying on Red Caboose, their financial status, and their
interest in model railroads as a recreational activity.

That a taxpayer operates an activity in a businesslike
manner and maintains complete and accurate books and records may
indicate that the activity is engaged in for profit.  Sec. 1.183-
2(b)(1), Income Tax Regs.  Respondent contends that petitioners
did not maintain adequate books and records for their model
railroad activity.  We agree.

Petitioners commingled their records for Red Caboose with
their personal records.  For 1990 and 1991, they recorded Red
Caboose's sales in their personal appointment book.  During 1990,
1991, and 1992, they commingled the receipts for Red Caboose's
expenses with their personal receipts.  They could not have
presented a complete set of records for Red Caboose, separate
from their personal records, at any time during the years in
issue.  Furthermore, they conducted some of Red Caboose's banking

transactions through their personal bank account and Mr. Lencke's former insurance bank account.

Petitioners argue that their record-keeping system for Red Caboose was complete and accurate, and thus evidence of their profit motive, because Mr. Lencke used the same system for his insurance activity.  We do not find their reasoning persuasive. Even if the record-keeping system used by petitioners for Red Caboose was an adequate record-keeping system for Mr. Lencke's insurance activity, which is an issue we do not address, it does not follow that such a system was a complete and accurate record-keeping system for a model railroad activity.

It is significant that petitioners did not have a concrete plan for improving the profitability potential of Red Caboose. During each year in issue, and in later years, they sustained sizeable losses in connection with Red Caboose.  In 1990 they reported a loss of $29,818; in 1991 they reported a loss of $17,911; and in 1992 they reported a loss of $24,058.  However, in spite of these large losses, they failed to substantially change their method of operating Red Caboose.  Other than staying at less expensive hotels and eating at less expensive restaurants while they were attending model railroad shows, they did little, if anything, to reduce Red Caboose's operating expenses. Moreover, they were not successful in implementing remedial measures to increase Red Caboose's revenues.  For example, they did not consider installing a separate telephone line for Red

Caboose so they could profit from telephone orders. In fact, petitioners' record-keeping system for Red Caboose was in such a disorganized state that we doubt they could have constructively analyzed Red Caboose's expenses and revenues and formulated a plan for increasing its profitability.

As we stated in Bessenyey v. Commissioner, 45 T.C. 261, 274 (1965), affd. 379 F.2d 252 (2d Cir. 1967), the presence of losses in the formative years of a business "is not inconsistent with an intention to achieve a later profitable level of operation, bearing in mind, however, that the goal must be to realize a profit on the entire operation, which presupposes not only future net earnings but also sufficient net earnings to recoup the losses which have meanwhile been sustained in the intervening years". See also sec. 1.183-2(b)(6), Income Tax Regs. Petitioners assert that they expected to incur losses from Red Caboose operations in its early years, but that eventually, as Red Caboose's sales increased, they expected to realize a profit. If Mr. Lencke were to die, they point out, his Social Security benefits would cease, and Mrs. Lencke would have to support herself with the proceeds from Red Caboose. We are not persuaded by these assertions. Petitioners have not formulated a concrete business plan to reverse the substantial losses sustained by them in operating Red Caboose. Thus, we are not convinced that Red Caboose (now Jim's House of Trains) will ever show a profit, let alone recoup the present history of losses.

A taxpayer who devotes much of his personal time and effort to carrying on an activity, particularly if the activity does not have substantial personal or recreational aspects, may have an intention to derive a profit. Sec. 1.183-2(b)(3), Income Tax Regs. Here, however, the record shows that petitioners failed to devote much of their personal time and effort to Red Caboose during the years in issue.

The relatively small amounts of gross receipts reported by petitioners from Red Caboose during 1990, 1991, and 1992, which were $1,100, $5,271, and $13,012, respectively, and the relatively few model railroad shows they attended during 1991, 1992, and 1993, which were 4, 13, and 24, respectively, show that petitioners did not devote much of their personal time and effort to Red Caboose, particularly in light of the recreational aspects involved in its operation. Therefore, based on the testimonial and documentary evidence in this record, we think petitioners did not devote sufficient personal time and effort to Red Caboose during 1990, 1991, and 1992 to establish that they engaged in their model railroad activity with an actual and honest objective of making a profit.

In our opinion petitioners' primary motivation in operating Red Caboose was other than to earn a profit. Respondent suggests that their motive was to use the losses it generated to offset income they received during 1990, 1991, and 1992. This seems probable. Substantial income from sources other than the

activity (particularly if the losses from the activity generate substantial tax benefits) may indicate that an activity is not engaged in for profit, especially if there are personal or recreational elements involved. Sec. 1.183-2(b)(8), Income Tax Regs.

On their 1990, 1991, and 1992 Federal income tax returns, petitioners reported taxable pension income in the amounts of $71,424, $35,524, and $33,714, respectively. The losses claimed by them from the operation of Red Caboose for 1990, 1991, and 1992 were $29,818, $17,911, and $24,058, respectively. Consequently, the losses that petitioners sustained in the operation of Red Caboose resulted in appreciable tax savings for them. The operation of Red Caboose, it appears to us, provided a method for attempting to achieve these tax savings while enabling Mr. Lencke to pursue his lifelong hobby of collecting model railroad equipment and memorabilia.

Respondent further contends that petitioners may have viewed Red Caboose as a recreational activity. The presence of personal or recreational motives in carrying on an activity may indicate that the activity is not engaged in for profit. Sec. 1.183-2(b)(9), Income Tax Regs. Both petitioners enjoy their model railroad activity and have never considered abandoning it. Mr Lencke has been collecting model railroad equipment and memorabilia for over 50 years. One reason petitioners started Red Caboose was to provide Mr. Lencke with an activity to occupy

his mind and his time after his retirement as an insurance agent. Thus, we think Red Caboose allowed Mr. Lencke to pursue, upon his retirement, his interest in and the pleasures of collecting model railroad equipment and memorabilia. Although its operation extended petitioners' interest in model railroading into a more formal pursuit, it does not necessarily follow that they were primarily motivated by an intention to make Red Caboose a profitable venture. While it is not required that a taxpayer dislike an activity before it will be considered a business and not a hobby, Jackson v. Commissioner, 59 T.C. 312, 317 (1972), petitioners have not shown a profit objective with respect to their model railroad activity. Consequently, their interest in operating Red Caboose has strong recreational and personal elements.

In reaching our conclusion that Red Caboose's operation was not an activity engaged in by petitioners for profit, we have considered that, before starting Red Caboose, they planned and coordinated the activities to be pursued through Red Caboose, visited model railroad shows, and sought advice from various vendors of model railroad supplies, and that they promoted Red Caboose by advertising in model railroad and toy magazines, publishing and distributing a two-page flyer listing Red Caboose's merchandise, creating business cards, and allowing visitors to tour the model railroad collection displayed in the basement of their home. We have also considered that petitioners

persuaded suppliers to sell to them at wholesale prices during and after 1991; that they later obtained a retail merchant certificate for Red Caboose; and that they attempted to persuade credit card companies, Visa and MasterCard, to allow Red Caboose to accept their credit cards for its model railroad orders during the years in issue. However, in weighing these facts along with all the other facts in this record, we have concluded, on balance, that petitioners' objective in operating Red Caboose was not the actual and honest intention of making a profit during the years in issue. Accordingly, we sustain respondent's determination. Having decided that petitioners are not entitled to the loss deductions resulting from their model railroad activity in 1990, 1991, and 1992, it is unnecessary to address respondent's alternative position that petitioners are not entitled to additional depreciation deductions claimed for 1991 and 1992.

II. Claimed Nonbusiness Bad Debt Deduction

Section 166(d) allows a deduction for a nonbusiness debt that becomes worthless within the taxable year, but provides that the loss shall be treated as a short-term capital loss to a taxpayer other than a corporation. To qualify for a deduction for a worthless debt, the taxpayer must show that the debt became totally worthless within the taxable year in which the deduction is claimed because no deduction is "allowed for a nonbusiness debt which is recoverable in part during the taxable year." Sec.

1.166-5(a)(2), Income Tax Regs; Andrew v. Commissioner, 54 T.C. 239, 245 (1970). Whether a debt has become worthless within a particular year is a question of fact, Perry v. Commissioner, 22 T.C. 968, 973 (1954), to be determined on the basis of objective factors, not on the taxpayer's subjective judgment as to the worthlessness of the debt. Fox v. Commissioner, 50 T.C. 813, 823 (1968), affd. per curiam without published opinion 25 AFTR 2d 70-891, 70-1 USTC par. 9373 (9th Cir. 1970). Generally, the year of worthlessness must be fixed by identifiable events which form the basis of reasonable grounds for abandoning any hope of recovery. Crown v. Commissioner, 77 T.C. 582, 598 (1981).

The Court of Appeals for the Seventh Circuit has set forth some of the relevant factors to be considered in determining whether a debt is worthless. These factors include the debtor's serious financial reverses, insolvency, lack of assets, persistent refusals to pay on demand, ill health, death, disappearance, abandonment of business, bankruptcy, and receivership, as well as the debt's unsecured and subordinated status and expiration of the statute of limitations. Cole v. Commissioner, 871 F.2d 64, 67 (7th Cir. 1989), affg. T.C. Memo. 1987-228. Some of the factors indicating that a debt is not worthless are the creditor's failure to pursue payment (especially if the debtor is a relative or friend), willingness to make further advances, availability of collateral or guarantees by third parties, the debtor's earning capacity, minor

defaults, payment of interest, and sluggish business conditions. Id.

Petitioners rely on the Christophers' poor financial condition as proof that the debt became worthless during 1990. But the evidence of worthlessness upon which they rely is tenuous at best. For example, some of the factors which caused them to consider the debt worthless in 1990 are: (1) They heard rumors the Christophers were experiencing financial problems in 1990 and had sought help through various local charities; (2) they believed Mr. Christopher was "out of work" in 1990; (3) the Christophers sold their flower shop in 1991; (4) the Christophers' home was foreclosed after 1990; (5) the Christophers asked petitioners not to cash their checks; and (6) the Christophers said they could not repay the debt. However, the test for worthlessness is objective, not subjective. Redman v. Commissioner, 155 F.2d 319, 320 (1st Cir 1946), affg. a Memorandum Opinion of this Court. Petitioners' belief that the Christophers were unable to pay their debt was based on subjective concerns rather than the objective view of the Christophers' financial inability to pay. An examination of the facts shows that petitioners had a significant hope for recovery of at least a portion of the amount loaned to the Christophers. Although they discussed repayment of the $6,000 loan with the Christophers in December 1990, they did not persistently press them for payment. The Christophers sold their

flower shop for $18,000 in 1991, yet petitioners failed to make any attempt to recover some of the proceeds received from the sale. Petitioners failed to persuade us that their friendship with the Christophers was not the main reason for the refusal to press them for payment. Petitioners also failed to show, among other things, whether the Christophers lacked assets, were in ill health, had filed for bankruptcy, were insolvent, or were incapable of paying their debt for some other reason. In short, petitioners have not shown that collection efforts would have been futile. Their belief that the debt was worthless and their choice not to pursue reasonable collection efforts are insufficient to establish worthlessness.

Accordingly, we hold that petitioners have failed to prove that the debt which the Christophers owed them became worthless in 1990. Therefore, they are not entitled to a nonbusiness bad debt deduction in that year.

III. <u>Self-Employment Taxes on Residual and Renewal Insurance Premiums</u>

Section 1401 imposes a tax upon each individual's "self-employment income". "Self-employment income" is defined in section 1402(b) as "net earnings from self-employment" with certain exceptions not relevant to this case. Net earnings from self-employment are defined in section 1402(a) as "gross income derived by an individual from any trade or business carried on by such individual, less the deductions allowed by this subtitle

which are attributable to such trade or business".  It is well established that the earnings of an insurance agent who is an independent contractor are "self-employment income" subject to self-employment tax.  Simpson v. Commissioner, 64 T.C. 974 (1975).

In Newberry v. Commissioner, 76 T.C. 441, 444 (1981), this Court held that, for income to be taxable as self-employment income, "there must be a nexus between the income received and a trade or business that is, or was, actually carried on."  Under our interpretation of the "nexus" standard, any income must arise from some actual (whether present, past, or future) income-producing activity of the taxpayer before such income becomes subject to self-employment tax.  Id. at 446.  And section 1.1402(a)-1(c), Income Tax Regs., provides that gross income derived from an individual's trade or business may be subject to self-employment tax even when it is attributable in whole or in part to services rendered in a prior taxable year.

First, we must decide whether the residual premiums received by Mr. Lencke in 1990 and 1991 from Farm Bureau are subject to self-employment tax.  Respondent contends that section 1401 imposes self-employment tax upon this type of income.  We agree. Petitioners have the burden of proving that the residual premiums received by them are not subject to self-employment tax.  Because they have chosen not to pursue this issue in either their opening brief or reply brief, we consider it to have been conceded.

Rule 151(e); Remuzzi v. Commissioner, T.C. Memo 1988-8, affd. without published opinion 867 F.2d 609 (4th Cir. 1989).

Second, we must decide whether the payments in lieu of renewal commissions received by petitioners in 1990 are subject to self-employment tax. Petitioners contend that these payments are analogous to the "termination payments" received by the taxpayer in Milligan v. Commissioner, 38 F.3d 1094 (9th Cir. 1994), revg. T.C. Memo 1992-655, and are, therefore, not subject to self-employment tax. To the contrary, respondent contends the payments merely provided a uniform manner of payment of renewal commissions and retained the characteristics of renewal commissions. Thus, respondent concludes that the payments are subject to self-employment tax just as renewal commissions are subject to self-employment tax. We agree with respondent.

The courts which have examined the issue of whether payments made in lieu of renewal commissions are subject to self-employment tax agree that the payments are of the same character as renewal commissions and are, therefore, subject to self-employment tax. See Becker v. Tomlinson, 9 AFTR 2d 1408, 62-1 USTC par. 9,446 (S.D. Fla. 1962); Erickson v. Commissioner, T.C. Memo. 1992-585, affd. without published opinion 1 F.3d 1231 (1st Cir. 1993). In the Becker case, the taxpayer, an insurance agent, was entitled to receive renewal commissions after the termination of his contract. An amendment to his original contract, however, allowed the taxpayer to choose to receive

uniform, regularly scheduled payments in lieu of his renewal commissions. Upon his retirement as an insurance agent, the taxpayer elected to receive the uniform, regularly scheduled payments rather than the renewal commissions to which he was entitled. The District Court reasoned that the payments made to the taxpayer in lieu of renewal commissions merely provided for a uniform manner of payment of renewal commissions and did not alter the nature of the payments. Because renewal commissions are subject to self-employment tax, the District Court held that the payments made in lieu of the renewal commissions are also subject to self-employment tax.

Similarly, in the Erickson case, this Court held that payments made under a Settlement Agreement that replaced the taxpayer insurance agent's former agreement governing the payment of renewal commissions were subject to self-employment tax. The taxpayer in the Erickson case, who had recently separated from service as an insurance agent, was entitled to receive renewal commissions pursuant to a Leveling Agreement that provided for monthly payments over a 180-month period. However, as a result of disputes between the taxpayer and the insurance company, the insurance company entered into a Settlement Agreement with the taxpayer. The Settlement Agreement nullified the Leveling Agreement and provided that the taxpayer was to receive uniform, monthly payments over a 240-month period, and then smaller uniform, monthly payments for the remainder of his life.

Reasoning that the payments under the Settlement Agreement had the same character as the renewal commissions, we concluded that the payments were subject to self-employment tax.

Like the payments received by the taxpayers in the Becker and Erickson cases, the payments received by Mr. Lencke in lieu of renewal commissions retained the character of the renewal commissions they replaced. Petitioners cite Gump v. United States, 86 F.3d 1126 (Fed. Cir. 1996), and Milligan v. Commissioner, 38 F.3d 1094 (9th Cir. 1994), revg. T.C. Memo. 1992-655 to support their position that the payments received by Mr. Lencke in lieu of renewal commissions were analogous to "termination payments" and therefore not subject to self-employment tax. However, the payments in the Gump and Milligan cases were not payments made in lieu of renewal commissions. The right to the payments in those cases arose from the cancellation of the insurance agents' business arrangements. They were payments specifically designated as "termination payments" or "extended earnings", and, under certain circumstances, the agents could have lost their right to receive the payments.[8] Milligan

---

[8] In Milligan v. Commissioner, 38 F.3d 1094, 1096-1097 (9th Cir. 1994), revg. T.C. Memo. 1992-655, the agent's right to receive termination payments would have been canceled if all of his former customers had canceled their non-life insurance policies during the first post-termination year. In Gump v. United States, 86 F.3d 1126, 1128 (Fed. Cir. 1996), the agent would not have received his extended earnings if he had attempted to induce his agency's policyholders to lapse, cancel, or replace their insurance contracts.

v. Commissioner, 38 F.3d at 1096-97; Gump v. United States, 86 F.3d at 1127-28. Thus, the Milligan and Gump cases are not factually similar to the situation confronting us here. Moreover, the Court of Appeals for the Ninth Circuit specifically noted that renewal commissions are subject to self-employment tax. Milligan v. Commissioner, 38 F.3d at 1098 (citing Erickson with approval). The Court of Appeals for the Federal Circuit also recognized the distinction between renewal commissions and "extended earnings". Gump v. United States, 86 F.3d at 1130. Likewise, our recent opinion in Jackson v. Commissioner, 108 T.C. 130 (1997), following the decision of the Court of Appeals in Milligan, which dealt only with "termination payments", is distinguishable from the renewal commissions involved in this case.

Accordingly, we hold that the payments received by Mr. Lencke in lieu of renewal commissions are subject to self-employment tax because they retained the character of the renewal commissions they replaced.

IV. Accuracy-Related Penalties

Section 6662(a) imposes a penalty equal to 20 percent of the portion of the underpayment due to any substantial understatement of income tax. Section 6662(d) defines both "understatement" and "substantial understatement". Pursuant to section 6662(d)(2), when the amount of tax required to be shown on a return exceeds the amount actually shown (less any rebates provided in section

6211(b)(2)), then there is an understatement of tax. This understatement is "substantial" if the excess amount exceeds the greater of $5,000 or 10 percent of the amount of tax required to be shown on the return. Sec. 6662(d)(1). However, section 6662(d)(2)(B) provides that the understatement is reduced to the extent that (1) the tax treatment of an item shown on the return was supported by substantial authority or (2) the facts affecting the item's tax treatment are adequately disclosed and there is a reasonable basis for such treatment.

Petitioners' 1990 Federal income tax return reported a tax liability of $392. Based upon concessions made by petitioners in the stipulations of facts, without accounting for the contested adjustments, there appears to exist an understatement of tax, which exceeds the greater of $5,000 or 10 percent of the amount of tax required to be shown on the return.

Section 6662(a) imposes a penalty equal to 20 percent of the portion of the underpayment due to negligence or disregard of rules or regulations. The term "negligence" includes any failure to make a reasonable attempt to comply with the provisions of the Internal Revenue Code and "disregard" includes any careless, reckless, or intentional disregard. Sec. 6662(c).

On their 1991 and 1992 Federal income tax returns, petitioners admittedly claimed a depreciation deduction for a boat which they now concede is not properly deductible. Mr. Lencke purchased the boat with no business purpose. Petitioners

also claimed a depreciation deduction for their lawn mower and a sprinkler which had no apparent business purpose, for an answering machine when they did not have a business telephone line (they now concede that the answering machine was not depreciable), and for 100 percent of a shed which they now concede was only 25 percent depreciable during 1991 and 50 percent depreciable during 1992. Petitioners have also conceded some deductions they claimed because they were either improper or unsubstantiated. Therefore, we hold that they are liable for the negligence penalty for the above items.

We conclude, however, that petitioners made a reasonable attempt to comply with the Code provisions with respect to their model railroad activity, and therefore are not liable for a penalty on that portion of the underpayment for 1990, 1991 or 1992. Sec. 6664(c)(1).

In reaching all of our conclusions herein, we have considered all arguments made by petitioners and, to the extent not discussed above, find them to be without merit.

To reflect conceded and settled issues and our conclusions with respect to the disputed issues,

Decision will be entered

under Rule 155.